UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| LAVERNE RELIFORD-THOMAS, | ) |
| | ) |
|    Plaintiff, | ) |
| | ) |
|     vs. | ) CAUSE NO. 1:11-cv-303-WTL-TAB |
| | ) |
| ELI LILLY & COMPANY, | ) |
| | ) |
|    Defendant. | ) |

### ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the Defendant's motion for summary judgment (dkt. no. 50). The motion is fully briefed and the Court, being duly advised, **GRANTS** the motion for the reasons set forth below.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed and all reasonable inferences must be drawn in the non-movant's favor. *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007); *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Id.* Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court

is not required to scour the record in search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.,* 242 F.3d 713, 723 (7th Cir. 2001).

## II. FACTUAL BACKGROUND

The facts of record, viewed in the light most favorable to Plaintiff Laverne Reliford-Thomas (hereinafter referred to as "Reliford")[1] are as follow.

Reliford, who is African-American, began working for Defendant Eli Lilly & Company ("Lilly") in 1986 and worked in a variety of positions and departments during her long tenure with the company.

In 2002, Reliford was advised that her position was being eliminated because Lilly needed to use the building that she was working in to manufacture a new product. Approximately 200 employees were impacted by this reorganization. Reliford applied for a few specialist positions but was ultimately offered (and accepted) an infrastructure position.

About a year later, Reliford was informed that her position, along with those of her three coworkers, was again being eliminated because of another reorganization ("the 2003 Reorganization"). Reliford applied for several positions, including some that would be promotions, but ultimately was offered and accepted the position of data migrator, which was a lateral transfer. Two of her three coworkers, all of whom were white, secured new positions that were several levels higher than the positions that were eliminated.

Sometime in 2006, Reliford obtained the position of Senior Project Management Assistant in the Data Department for Stewardship/Enterprise Information, which was also known as a "data steward." Reliford initially reported to Mary Chris Broughton. In February 2007, Judith Bosler became Reliford's supervisor.

---

[1] While the Plaintiff is named as Laverne Reliford-Thomas in her Complaint, she has since changed her name to Laverne Reliford. *See* Reliford's Response at 1 n. 1.

In September 2007, Reliford became involved in an employment discrimination lawsuit against Lilly ("the Welch Case"),[2] alleging that she was treated in a discriminatory manner during the 2003 reorganization.

Prior to joining the Welch Case, Reliford consistently received ratings of "Commendable/Proficient" on her performance evaluations.

On May 21, 2010, Bosler gave Reliford a verbal warning regarding poor work performance. The warning (which, despite its name, was reduced to writing) recited that Reliford "[lacked] foundational SAP knowledge and [understanding of] the connection of changes made in project systems and how they related to the drug development process," that Reliford was not demonstrating "productivity commensurate with peers/level" and "accuracy commensurate with peers/level" and provided specific examples of performance issues.

On December 10, 2010, Bosler issued Reliford a written warning, which is the second step in Lilly's progressive discipline process. The warning identified issues with accuracy, job knowledge, ownership of problem solving and failure to follow a service level agreement, and provided numerous examples of performance deficiencies.

On March 28, 2011, Reliford was notified that her position was once again being eliminated. Reliford's coworker, Kris Stone, was also impacted by the reorganization. Additionally, four other positions in another group were eliminated. The purpose of the reorganization was to consolidate various tasks across two Project Management groups, the

---

[2]The Welch Case was filed as a class action suit in 2006. Reliford was added as a named plaintiff in the case in the second amended complaint, which was filed on September 8, 2008; however, she was listed in a filing by the plaintiffs in September 2007 as one of numerous "putative class members [who] have agreed to be identified as of September 4, 2007." The class allegations in the Welch Case eventually were withdrawn, the plaintiffs' claims were severed, and the plaintiffs were directed to file separate complaints if they wished to pursue their individual claims against Lilly.

group in which Reliford worked (Enterprise Information Group ("EIG")) and Pharmaceutical Project Management ("PPM"). The primary reasons for the reorganization were reducing cost, improving efficiency and improving quality of service; it had nothing to do with Reliford personally. All six of the affected employees were advised that they had twelve weeks to find another position at Lilly.

The reorganization left three open positions, but Reliford did not apply for them because she no longer wished to report to Bosler. Reliford did apply for several positions, some of which she was rejected for automatically by the computerized job posting system. Reliford was invited to interview (either via telephone or in person) for five of the remaining positions for which she applied; however, she was ultimately not selected for any of them. Different hiring managers were involved in each of the decisions not to hire Reliford, and none of the hiring managers was aware that Reliford was involved in litigation against Lilly at the time he decided not to hire Reliford for the position for which she interviewed.

Because Reliford did not find another position within Lilly within the twelve weeks allotted, her employment with Lilly was terminated.

### III. DISCUSSION

As an initial matter, Lilly asks the Court to ignore certain documents cited by Reliford in opposition to the instant summary judgment motion because they were not produced by Reliford during the discovery period in this case. As Lilly correctly notes, "when a party relies on evidence that [she] failed to disclose under Fed. R. Civ. P. 26(a)—as there can be no dispute Reliford is doing here—'[t]he sanction of exclusion is . . . automatic and mandatory' under Fed. R. Civ. P. 37(c)(1) 'unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.'" Lilly Reply at 2 (quoting *Finley v. Marathon Oil Co.*, 75 F.3d

1225, 1230 (7th Cir. 1996)). Reliford's response to Lilly's argument is entirely unsatisfactory. Reliford gives no explanation at all regarding why the documents were not produced in a timely matter, thereby conceding that the Rule 26 violation was not "justified." Reliford then argues that the violation was harmless because once the documents were produced—several weeks after Lilly's motion for summary judgment was filed—Lilly "had ample time to cure any resulting prejudice by attempting to reopen discovery, redepose Ms. Reliford, or amend its motion for summary judgment." Reliford Surreply at 3. That argument is, in a word, silly. The burden of filing an amended summary judgment motion to address late-produced documents is the exact kind of prejudice that Rule 26 deadlines are designed to avoid. Indeed, the reason that a liability discovery deadline typically is established for approximately a month prior to the dispositive motion deadline is that it is futile to prepare a summary judgment motion based upon the available evidence if the response to the motion then expands the universe of available evidence.

    That said, while the late production of the documents in question is not harmless for the reason urged by Reliford, the Court finds it harmless for another reason: even if the untimely documents are not excluded pursuant to Rule 37(c)(1), Lilly is still entitled to summary judgment on all of Reliford's claims. Therefore, while the documents are subject to being excluded because they were untimely produced, the Court nonetheless includes them in the analysis below because, in the end, their inclusion is harmless to Lilly for the sole reason that it is unhelpful to Reliford.

    Turning to the merits of Lilly's motion, Lilly argues that it is entitled to summary judgment on all of Reliford's claims. Reliford, in turn, argues that there are genuine issues of material fact that preclude summary judgment as to both her claim for retaliation and her claim for race discrimination. Both claims are addressed, in turn, below.

### A. Retaliation for Participating in the Welch Case

Reliford alleges that Lilly violated 42 U.S.C. § 1981 by retaliating against her for participating in the Welch Case. To survive a motion for summary judgment on a retaliation claim, a plaintiff may use either the direct or indirect method. Reliford invokes both in this case.

#### 1. Direct Method

"To establish retaliation under the direct method, a plaintiff must present evidence, direct or circumstantial, showing that: (1) [she] engaged in a statutorily protected activity; (2) [she] suffered a materially adverse action; and (3) a causal connection exists between the two." *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012). In this case, there is no question that Reliford satisfies the first prong, inasmuch as she joined the Welch Case and by doing so asserted a claim against Lilly for race discrimination.

With regard to the second prong, a "materially adverse action" in the context of a retaliation claim is an action that "might dissuade a reasonable worker from making or supporting a charge of discrimination." *Brown v. Advocate South Suburban Hosp.,* 700 F.3d 1101, 1106-07 (7th Cir. 2012) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). "Not everything that makes an employee unhappy is an actionable adverse action," and "it is important to separate significant from trivial harms." *Id.* at 1106.

Reliford asserts that Lilly "retaliated against her because of her participation in the [Welch Case] by failing to provide her with the same mentorship, training, and support it provided to similarly situated employees who did not file suit" and that Lilly's retaliation "resulted in [her] termination" after the 2011 reorganization. Reliford Response at 19. It is important to note that Reliford does not dispute that she was terminated because she did not find a new position within the twelve weeks she was given after the reorganization was announced,

and she does not claim to have any direct evidence that the reorganization itself was motivated by either race discrimination or retaliation. Indeed, Lilly asserts as an undisputed fact that the reorganization "had nothing to do with Reliford personally," and Reliford does not dispute that fact in her response. So—at least as far as her direct method analysis goes—Reliford does not allege that the actual act of terminating her was retaliatory; rather, she alleges that the retaliation she suffered caused her to be unable to find a new position, so that the retaliatory acts were ultimately the reason she was terminated rather than placed into a new job at Lilly after the reorganization.

In support of her assertion that she experienced materially adverse actions after she joined the Welch Case, Reliford points to several pieces of evidence.[3]

First, Reliford cites two portions of her deposition that she characterizes as "describing how [Lilly] excluded [her] from meetings and trainings." Reliford Response at 21. In the first cited excerpt, Reliford testifies that she did not "go to a lot of other meetings" that two of her coworkers attended. There is no explanation of the type of meetings she is referring to or why she did not attend them; in other words, this excerpt provides no support for the assertion that she was "excluded" from meetings. In the second cited excerpt, Reliford testified as follows:

Q: Are there other ways in which she [Bosler] treats[4] the two of you differently?

A: Kris and I?

Q: Yeah.

---

[3] The Court notes that, in the section of her brief immediately preceding her direct method argument, Reliford points to several additional things she asserts that Lilly subjected her to after she joined the Welch Case, such as the less-than-stellar performance reviews and not allowing her to work from home instead of using leave time. Reliford does not include these things in either her direct or indirect method discussion, however, or otherwise explain how she believes they fit under either framework.

[4] The question is in the present tense because that portion of Reliford's deposition was taken before her employment was terminated.

7

>A: Other than allow her to go to training and – I don't know what other meetings Kris go to. I have said sometimes where are you going, Kris, she said off to a meeting. What is this meeting about[?] Oh, it's about SAP. That's what I work with too, but. I don't have a problem with her going to the meeting, but bring the information back. That's what they say is supposed to happen when we have our—our weekly meetings, but that hardly ever happens.

Reliford Dep. at 135-36.

Reliford correctly points out that the "discriminatory denial of job-related training can constitute an adverse employment action under Title VII" and, by extension, § 1981.[5] *Durkin v. City of Chicago* 341 F.3d 606, 611 (7th Cir. 2003) (citing *Pafford v. Herman*, 148 F.3d 658, 667 (7th Cir. 1998)). However, Reliford has not presented sufficient evidence from which a reasonable jury could find that she was denied any training at all, as she cites to only a vague, off-hand reference to allowing her coworker to go to training. Nor does Reliford's testimony support her allegation that her supervisor improperly denied her the opportunity to attend meetings—in fact, she specifically says she did not "have a problem with" Kris being the one who attended the meetings in question. Her complaint was actually that Kris—her coworker—did not "bring the information back" to her, and there is no indication that Kris's failure was at the behest of, or even known by, Reliford's supervisor.

Next, Reliford points to deposition testimony that she characterizes as "describing how [she] asked for help in securing another position but was ignored." Reliford Response at 21. In the excerpt in question, Reliford describes how she asked Carol Feeney, her supervisor's supervisor, if she would call another manager and explain that Reliford was interested in a particular position. Reliford was concerned that she would be passed over for an interview for the position because she had missed a call from the hiring manager when she was out of the

---

[5] "[T]he elements and methods of proof for § 1981 claims are 'essentially identical' to those under Title VII." *Brown*, 700 F.3d at 1104 n.1 (citing *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010)).

office.  Feeney responded "oh, well, I'm sure he'll call back."  Reliford Dep. at 288.  He did, in fact, call back, and Reliford was interviewed for the position.  Accordingly, even assuming that denying a request for help in securing an interview can constitute an adverse employment action, it certainly was not in this case, as Reliford suffered no adverse effect from Feeney's refusal to make the call.

Next, Reliford characterizes a portion of her deposition as "describing how white employees received assignments that would allow for promotion."  Reliford Response at 21-22.  In the cited excerpt, Reliford was asked what she meant by earlier testimony that she believed Bosler was not providing her with the coaching she needed to move up from a Level 34 position to a Level 36 position:

> A:  There's things you can—in order to start moving in to another position, you need to be given assignments that fit into these criterias [sic.].
>
> Q:  So what particular assignments did you think she should be giving you that she wasn't giving you?
>
> A:  Versus what Kris is, in the old 32, 34, I'm a 34, Kris is a 36, and Kris's early opportunities were going to various meetings, working with the PMs.  I had no opportunity to do a lot of that.  I tried to work with the assistants to learn more about the different phases and the programs.

Reliford Dep. at 145.  However, Reliford then acknowledged that Kris was a Level 36 when Reliford came to the data steward area and that Reliford therefore did not know anything about "how [Kris] was promoted to that higher level."  *Id.* at 145-46.  In other words, Reliford's testimony establishes only that Kris was given certain opportunities as a Level 36 (with more experience in the department) that Reliford, a Level 34, was not.  No reasonable jury could infer from that testimony that Reliford was denied any opportunity that she was due as a Level 34, let alone that such a denial constituted a materially adverse action.

9

Finally, Reliford points to the fact that in 2008 Bosler told her not to apply for a position that would have been a promotion. Bosler Dep. at 57. Bosler explained the reason for this as follows:

> The timing wasn't right in terms of stability of our group, which means things were going on within the group that her absence and having to get a new person in would not have been good for business. The fact that when you get—when you post for a higher level position, in order to be competitive, you need to have performed that level of work in your current position, and she had not been performing specialist level responsibilities or performance.

Bosler Dep. at 54. Bosler further testified that she had also told two other employees not to post for other positions, including Kris Stone, Reliford's white coworker. *Id.* at 55-56. Therefore, the undisputed record demonstrates that Bosler's instruction to Reliford not to apply for a particular promotion in 2008 was based on business reasons and was consistent with Bosler's treatment of other employees; in other words, there is simply no evidence that Bosler acted in retaliation for Reliford's participation in the Welch Case.

Reliford has not pointed to any evidence from which a reasonable juror could determine that Lilly took actions against her in retaliation for her participation in the Welch Case that either constituted adverse actions themselves or led to her termination. Accordingly, Reliford's retaliation claim fails under the direct method.

### 2. Indirect Method

Under the indirect, burden-shifting approach, a plaintiff

> may establish a prima facie case of retaliation by showing that: (1) [she] engaged in a statutorily protected activity; (2) [she] met his employer's legitimate expectations, i.e., [she] was performing his job satisfactorily; (3) [she] suffered a materially adverse action; and (4) [she] was treated less favorably than some similarly situated employee who did not engage in the statutorily protected activity. Once a plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a non-discriminatory reason for discharging the plaintiff. If the defendant meets its burden, the burden shifts back to the plaintiff

to show that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual.

*Harper*, 687 F.3d at 309 (citations omitted).

There is no dispute that Reliford satisfies the first two prongs of the indirect framework. With regard to the third and fourth prongs, Reliford asserts the following: "Ms. Reliford was similarly situated to the five other employees affected by the reorganization,[6] and Defendant enabled every non-litigating employee to secure a position after the reorganization." Reliford Response at 23 (footnote added). Reliford cites two pages of her deposition as evidence supporting this proposition. The cited testimony establishes that (1) there were four employees other than Reliford who were affected by the reorganization; (2) three of those employees applied for and received the three positions that survived the reorganization; (3) the fourth employee "called her old department" and secured a position there.[7] Nothing about this testimony indicates that Reliford's management "enabled" the other employees in ways that they did not "enable" Reliford.

Reliford does state in other parts of her deposition that she believes she did not secure another position because she did not have the support of her manager:

> Q: Now, your complaint alleges in general that you did not receive the support of management in seeking a new position. What do you mean by that?
>
> A: I would think that if management . . . they could have helped me find a position due to my—and I'm looking at 25 years. And I was a loyal employee with this company. I spent half my life there. And it wasn't like our department had hundreds of people they were reallocating. There was just, what, three positions, six. One girl already got a job. They could have helped me found a position.

---

[6] There were actually six positions impacted by the reorganization, but it is undisputed that one of the employees did not seek a new position because she was planning to end her employment with Lilly anyway.

[7] Lilly points out, correctly, that there are evidentiary problems with this factual assertion, but the Court takes it at face value for purposes of this Entry.

>Q: And what is it that you think that your management should have done to help you?
>
>A: Call these hiring managers for support.
>
>Q: Anything else?
>
>A: No.

Reliford Dep. at 303. The problem is that three of the coworkers in question applied for and received the three positions that remained after the reorganization—positions that Reliford did not apply for because she did not want to report to Bosler any longer, Reliford Dep. at 260—and the fourth got her position by calling her old manager and returning to her old department. There is no evidence, then, that any similarly situated employee was given the type of support from Lilly management that Reliford alleges she was denied.[8] In other words, while it is true that out of the six employees affected by the reorganization only Reliford was terminated, there is no evidence that her termination resulted from Reliford receiving less assistance from management than her coworkers.

---

[8]Reliford makes much of an email message between herself and Jeri Woodson, a Lilly supervisory employee in another department, dated May 25, 2010, in which Woodson says: "Are you keeping records of all of this? And what is the proof they have that goes with the 'fail'? This is a bad time to be in this position, and definitely not good for your sanity. Not to be funny, but have you thought of going to talk to one of the docs about the stress and what you are feeling? Or would you rather not put that kind of notation on yourself? Just a thought . . . I'm not sure what to tell you, what about HR? but you are part of a suit aren't you?" Reliford cites this email message for the proposition that Lilly "knew of [her] participation in the [Welch Case] and did not help [her] secure a new position as a result of her participation." Reliford Brief at 19. Putting aside the obvious evidentiary problems with this document, as well as the fact that the email was sent almost a year prior to the 2011 reorganization, and therefore has nothing to do with whether Reliford received help finding a new position after hers was eliminated, Woodson's comment, at most, can be viewed as an expression of her own opinion regarding what Lilly's human resources department would do, and there is no evidence that Woodson's opinion had any basis in fact.

Reliford's argument is a bit slippery, however, and at times it appears that she identifies the adverse action as her termination, rather than a lack of support that caused her termination. Specifically, in discussing Lilly's "legitimate, non-discriminatory reason for its adverse actions" against her, Reliford discusses whether the reorganization itself was legitimate, or whether it was simply a pretext, arguing that "[t]he evidence establishes that [Lilly's] decision to reallocate Ms. Reliford's department was actually a decision to terminate Ms. Reliford's employment." Reliford Response at 25. The evidence establishes nothing of the sort, however. Reliford asserts that Lilly "provides absolutely no evidence" for its claim that the reorganization was motivated, in part, by the fact that "changes in technology and other efficiencies had resulted in work reduction for [Lilly's] Sr. Assistants," Feeney Aff. at ¶ 3; however, Feeney's affidavit provides the requisite evidence regarding Lilly's business reasons for the reorganization. Reliford attempts to dispute Lilly's stated business reason by pointing to evidence that she asserts shows that "rather than experiencing a reduction in work before the reorganization, the department's workload exceeded the staff's capabilities: Sr. Assistants constantly had to take overtime to complete assignments." The only "evidence" cited by Reliford for this assertion is the following: (1) A May 2009 instant message conversation between Reliford and a coworker discussing how another coworker (Kris Stone) was working from home when she was scheduled to be on vacation; and (2) an April 2008 instant message between Reliford and Kris Stone in which Stone makes the statement "I just want to come in, do my work and go home and not take anything home with me." No reasonable jury could conclude from this evidence that "Sr. Assistants constantly had to take overtime assignments" or that Feeney's statement in her affidavit that "[i]n 2010 and early 2011, [Lilly] did a strategic assessment of internal capabilities" because, in part, Lilly was "aware that changes in technology and other efficiencies

13

had resulted in work reduction for our Sr. Assistants" is false.  Therefore, to the extent that Reliford asserts that the 2011 reorganization of her department was a retaliatory adverse action taken against her, she has not presented any evidence to support that claim.

Reliford has not pointed to any evidence from which a reasonable juror could determine either that Lilly treated her differently than any similarly-situated employee following the 2011 reorganization or that the reorganization itself was a retaliatory action taken against her. Accordingly, Reliford's retaliation claim fails under the indirect method, and Lilly is entitled to summary judgment on that claim.

### B. Race Discrimination

In addition to her retaliation claim, Reliford asserts a claim for racial discrimination under § 1981.  As Lilly correctly points out in its opening brief, the assertions in Reliford's Amended Complaint regarding this claim are very slim, consisting of the following:

> Ms. Reliford-Thomas has been adversely impacted by Lilly's Performance Management process. She has been paid less than white counterparts that performed the same work. In 2003, when Ms. Reliford-Thomas and her colleagues were redeployed, she was denied a promotion in favor of three white female colleagues with less experience than she. Ms. Reliford-Thomas has also requested assignments that would help her move to a higher position, but she did not receive any guidance. She has also seen white employees whom she has trained pass her in pay grade or level.
>
> Defendant grooms most white employees for rapid promotion and did not provide Plaintiff Laverne Reliford-Thomas the same opportunities because of her race.
>
> Defendant promotes most white employees early and often and did not provide Plaintiff Thomas the same opportunities because of her race.

Amended Complaint at ¶¶ 8, 16-17.  In its opening brief, Lilly argues that these allegations are insufficient to state a claim and therefore it is entitled to judgment on the pleadings.  The Court declines to examine the sufficiency of Reliford's Amended Complaint at this stage of the

14

litigation, however, especially in light of the fact that, as explained below, Lilly is clearly entitled to summary judgment on Reliford's discrimination claim.

As Reliford acknowledges,

> [t]o establish a prima facie case of discrimination a plaintiff must offer evidence that: (1) she is a member of a protected class, (2) her job performance met the employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff. Once a prima facie case is established, a presumption of discrimination is triggered. The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for its action. When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a "pretext," which in turn permits an inference of unlawful discrimination.

*Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (citations and internal quotation marks omitted). There is no dispute regarding the first and second elements in this case. With regard to the third element, Reliford argues that she "suffered a range of adverse employment actions: [Lilly] failed to offer her the same privileges of employment in terms of training, mentorship and support it offered white employees; Defendant denied her promotions and corresponding pay raises;[9] and Defendant terminated her employment." Reliford Response at 28.

As discussed at length above, Reliford has not presented evidence that she was denied "training, mentorship and support" after her involvement in the Welch Case. With regard to the period prior to the lawsuit, Reliford asserts that the person who was supposed to mentor her, Willa Paddock, instead showered attention on one of her coworkers, Tina Schulz. Reliford does not allege that Willa's behavior was motivated by race, however; rather she testified that Willa was a difficult person to get along with, and when asked why, she responded "Willa was—I

---

[9]While Reliford's Amended Complaint asserts that she was "paid less than white counterparts that performed the same work," Reliford has forfeited any claim based upon disparity in pay because she failed to develop it in her response to the instant motion, aside from pointing to some hearsay testimony in her deposition regarding a "spotlight bonus" received by a white coworker.

15

don't know if it was personal or she just didn't like a person. It depends." Reliford Dep. at 83. Further, while Reliford asserts in her brief that her supervisor in 2003, Larry Crump, "shunned [her] by not giving her training and the information to do her job effectively," Reliford Response at 5, the deposition testimony she cites actually refers to the fact that Willa "shunned" her:

> Q: So in what way were you shunned?
>
> A: I was never brought in to—brought up to speed of what was going on. I was never given the—the close training that you would see. It was a lot of different things, because it was a lot to learn and it was a lot more you needed to learn, but if you didn't' have all those—that information, you wouldn't have known what was going on.
>
> Q: What information were you not given?
>
> A: Certain things how to pull reports. Oh, gosh. How to efficiently process your tickets, what was the best way to process tickets. There was just a variety. Some—sometimes you just say okay, I'm just going to try to learn what I can learn with whoever I can get it learned from.
>
> Q: So the training problem goes back to your relationship with Willa?
>
> A. Yes.
>
> Q: Okay. Any other way that you thought there was favoritism within the group that you observed?
>
> A: Not offhand, no.

Reliford Dep. at 102-03. This testimony is insufficient to establish that the "shunning" and lack of mentoring Reliford describes constitutes a materially adverse employment action, which "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady v. Liberty Nat. Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir. 1993). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a

particular situation." *Id.* Not being chosen as the supervisor's favorite is not a materially adverse employment action, and other than the denial of a promotion, which is discussed below, Reliford does not assert that the behavior she describes had any effect on her career at Lilly.

In any event, Reliford's testimony establishes that Willa did not properly mentor Reliford, but it also establishes that Willa's failure was due to her personality and her favoritism of one particular coworker. Favoritism is not unlawful, however, as long as it is not based upon a protected category, and Reliford offers no evidence that the favoritism enjoyed by Tina—the "buddy-buddy type system" between Tina and her supervisor—was based on race; indeed, Reliford's own testimony is to the contrary. *Cf. Preston v. Wisconsin Health Fund,* 397 F.3d 539, 541 (7th Cir. 2005) ("Neither in purpose nor in consequence can favoritism resulting from a personal relationship be equated to sex discrimination.").

With regard to Reliford's claim that she was denied promotions, "*McDonnell Douglas* entitles a plaintiff in a Title VII case to a trial if (so far as pertains to this case) [she] can show that [she] was qualified for a promotion but was denied it and instead a member of a different race who was 'similarly situated' to [her] got the promotion, unless the defendant articulates (and the plaintiff fails to rebut) a nondiscriminatory reason for promoting that other person." *Stinnett v. City of Chicago*, 630 F.3d 645, 646 (7th Cir. 2011). Reliford asserts that at the time of the 2003 reorganization her three white coworkers—Julie, Jennifer, and Tina—secured positions "that were either promotions or positions with the possibility of promotion in the near future" and Reliford secured only a lateral position. However, Reliford has not demonstrated that she was qualified for any of the positions that her coworkers received, and indeed she cannot show that she was "denied" any of those positions because she concedes that she did not apply for any of them. Specifically, Reliford testified that Jennifer applied for and was hired for a position

before Reliford inquired about it and that she did not apply for the position that Tina received because she "just knew [she] wasn't going to get it" because of the favoritism between Tina and management. Finally, Reliford concedes that her third coworker, Julie, was not promoted at the time of the 2003 reorganization; she alleges only that she was promoted at some unspecified later time. Reliford simply has presented no evidence from which a reasonable jury could conclude that she was denied—that is, that she sought and did not receive—a promotion for which she was qualified and that the promotion was instead given to a similarly situated white employee.[10]

That leaves Reliford's termination. Termination is, of course, an adverse employment action. However, Reliford's claim that her termination was because of race discrimination fails for the same reason that her retaliatory termination claim fails: Reliford has not presented any evidence to refute Lilly's articulated legitimate reason for the 2011 reorganization that led to Reliford's termination.[11] Accordingly, Lilly is entitled to summary judgment on Reliford's race discrimination claim.

## IV. <u>CONCLUSION</u>

For the reasons set forth above, Lilly's motion for summary judgment is **GRANTED** and judgment will be entered in favor of Lilly on all of Reliford's claims.

---

[10] The Court notes that Reliford grossly overstates her own evidence in her statement of facts when she states that Lilly "regularly promoted white employees with only minimal experience at Lilly three levels at once." Reliford's Response at 6. Reliford cites her own declaration for that proposition. What the relevant paragraph in the declaration actually conveys, however, is that Lilly's "tradition" is that it takes "approximately 3+ years to move from one pay grade to the next," so that the occasion on which Reliford's two coworkers jumped up several pay grades at one time was an aberration, not something that happened "regularly." Reliford Dec. at ¶ 8. In other words, the relevant paragraph in her declaration actually contradicts the proposition for which Reliford cites it.

[11] The Court notes that Reliford does not allege that the individual decisionmakers who chose not to hire her for the positions she sought after the reorganization were motivated by race discrimination.

SO ORDERED: 03/06/2013

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification